Jones Livestock Feeding Company v. Commissioner. Henry C. Jones and Eunice Jones v. Commissioner.
Jones Livestock Feeding Co. v. Commissioner
Docket Nos. 907-64, 908-64.
United States Tax Court
T.C. Memo 1967-57; 1967 Tax Ct. Memo LEXIS 202; 26 T.C.M. (CCH) 306; T.C.M. (RIA) 67057; March 27, 1967
John R. Kline, Claude M. Maer, Jr. and Peter Meloy for the petitioners. Richard H. M. Hickok, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated proceedings the respondent initially determined the following income tax deficiencies: *203 Petitioner
Taxable Year Ended
Deficiency
Jones Livestock Feeding Co.
November 30, 1959
$3,877.52
November 30, 1960
8,933.21
November 30, 1961
6,801.51
Henry C. Jones and Eunice Jones
December 31, 1959
7,727.05
December 31, 1960
7,943.73
December 31, 1961
4,649.70
The parties have stipulated that Jones Livestock Feeding Company is entitled to a deduction for a net operating loss carryback from the taxable year ended November 30, 1963, to the taxable year ended November 30, 1960, in the amount of $198,005.62, computed as follows: Loss claimed per return
$240,707.47
Additional income and unallowable deductions: Omitted income from feeding cattle of Jones children
$29,784.30
Unallowable dues and subscriptions agreed to by peti-
tioners
696.40
Capital items improperly deducted as expenses
3,247.65
Cost of cattle given to others
6,250.00
Property taxes paid for Henry C. Jones by Jones Live-
stock Feeding Co.
546.50
Unallowable deductions for dues and subscriptions
2,150.00 Total adjustments to net operating loss claimed by petitioner, Jones
Livestock Feeding Company
$ 42,701.85
Operating loss carryback from FY ended November 30, 1963 to FY
ended November 30, 1960, as agreed to by respondent
$198,005.62
*204 Jones Livestock Feeding Company concedes that respondent was correct in disallowing its 1963 deduction for dues and subscriptions in the amount of $696.40, its 1963 deduction of capital items in the amount of $3,247.65, and its 1963 deduction of property taxes paid for Henry C. Jones in the amount of $546.50. In addition, Jones Livestock Feeding Company concedes respondent's adjustment to its charitable contributions deduction in 1960. Six issues remain for decision. They are: 1. Whether certain income derived from cattle feeding operations were properly reported as the income of Lois Irene Jones, James Thomas Jones and Henry Calvin Jones, or whether such income should have been treated as income of Jones Livestock Feeding Company under sections 61 and 482, Internal Revenue Code of 1954. [1]
2. Whether such income received from cattle feeding operations constituted constructive dividends to Henry C. Jones. 3. Whether income derived from the sale of potatoes in 1960 was properly reported by James Thomas Jones as his income or whether such amount should have *205 been treated as the income of Jones Livestock Feeding Company under sections 61 and 482. 4. Whether the income from the potato sale was a constructive dividend to Henry C. Jones. 5. Whether dues and subscriptions paid by Jones Livestock Feeding Company for a weather forecasting service in the fiscal year ended November 30, 1963, were deductible as ordinary and necessary business expenses of the corporation. 6. Whether, in the fiscal year ended November 30, 1963, Jones Livestock Feeding Company made nondeductible gifts of cattle to employees and, if so, the value thereof. If the Court determines that the income reported by Lois Irene Jones, James Thomas Jones and Henry Calvin Jones in the years 1959, 1960, and 1961 is taxable to Jones Livestock Feeding Company, the parties agree that it is taxable to that corporation in the fiscal years ended November 30, 1960, November 30, 1961, and November 30, 1962, respectively. Likewise, if the income reported by Lois Irene Jones, James Thomas Jones and Henry Calvin Jones in the years 1959, 1960, and 1961 is taxable to Henry C. and Eunice Jones as a dividend distribution from Jones Livestock Feeding Company, the parties agree that it is *206 taxable to them in the following years and amounts: Year
Amount
1959
$16,786.80
1960
13,079.83
1961
18,494.45
Findings of Fact Some of the facts have been stipulated by the parties. The stipulation and supplemental stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner in docket No. 907-64, Jones Livestock Feeding Company (hereinafter called Jones Livestock), is an Idaho corporation with its principal place of business at Eden, Idaho. Its Federal corporation income tax returns for the fiscal years ended November 30, 1959, November 30, 1960, and November 30, 1961, were filed with the district director of internal revenue at Boise, Idaho. Petitioners in docket No. 908-64, Henry C. and Eunice Jones (hereinafter called Henry and Eunice), are husband and wife, who now and at the time the petition was filed herein reside near Eden, Idaho. They filed their joint Federal income tax returns for the years 1959, 1960 and 1961 with the district director of internal revenue at Boise, Idaho. Henry and Eunice were married in 1938. They have four children. Their first child, Lois Irene Jones King (hereinafter called *207 Rene) of Menlo Park, California, was born on May 9, 1939. Carol Jones McFarland (hereinafter called Carol) of Eden, Idaho, was born in 1940. James Thomas Jones (hereinafter called Jim) was born on May 13, 1942, and is presently a senior at Northwestern University Law School. Henry Calvin Jones (hereinafter called Calvin) was born on May 19, 1944. He now owns and operates his own farm near Eden, Idaho. Henry started feeding cattle in Idaho in 1938. Over the years he has built his operation into the large business it is today. In January 1958, Henry incorporated his cattle feeding operations. Jones Land and Feed Yards, Inc., was formed and Henry transferred the cattle feeding yards and feed mill to it. It mills and sells feed for the cattle of, and leases its yards to, Jones Livestock, which was also incorporated in January 1958 and presently feeds and fattens around 10,000 head of cattle a year. Since the incorporation of these two companies, Henry has not fed or owned any cattle individually. Seventy percent of the cattle fed by Jones Livestock during the years 1959 through 1961 were owned by the company. The other cattle which it fed were owned by various people and corporations. *208 In the latter situation the owners would pay for the cattle and freight while Jones Livestock would pay the feeding and handling costs. When the cattle were sold, the owner would recover the cost of cattle plus freight while Jones Livestock would recover the cost of feed plus 6 cents a head per day for handling. The profit or loss resulting therefrom would be divided evenly between the owner and Jones Livestock. Such arrangements were ordinarily agreed to orally. The cost of feed is determined on the basis of feed checks. In the years 1959 through 1961, Jones Livestock would break even by charging cost of feed plus 6 cents a day if it fed 3,000 to 3,500 cattle. If more cattle were fed, the company made a profit by charging this rate for feed and handling costs. Henry bought cattle for Jones Livestock and other parties who feed their cattle with Jones Livestock. The bill of sale or cattle invoices were either in Henry's name or another order buyer and were never transferred to the real purchaser, even though the ownership was in such person or company. Neither Henry nor Jones Livestock ever issued a bill of sale upon selling the cattle fed with Jones Livestock, even though ownership *209 was in another person or company. The cattle fed at Jones Livestock received a brand inspection upon being checked into the company's yards. However, if they were feed lot cattle (which most of the cattle were), rather than cattle fed on grass, they were not rebranded. Instead, they were kept in separate pens in order to reflect their proper ownership. For the calendar years 1959, 1960, and 1961, Jim, Calvin and Rene, the three children of Henry and Eunice whose income the respondent asserts is properly income to Jones Livestock, reported the following cattle sales, potato sales, expenses and net profit: James
Henry
Lois
Thomas
Calvin
Irene
Year 1959:
Jones
Jones
Jones
Total
Cattle sales
$42,935.76
$42,935.76
$42,935.76
$128,807.28
Cattle purchases
14,671.28
14,671.28
14,671.28
44,013.84
Gross profit
$28,264.48
$28,264.48
$28,264.48
$ 84,793.44
Expenses: Feed
$22,376.43
$22,376.43
$22,376.43
$ 67,129.29
Interest
276.98
280.12
290.25
847.35
Accounting
10.00
10.00
10.00
30.00
$22,663.41
$22,666.55
$22,676.68
$ 68,006.64
Net profit reported
$ 5,601.07
$ 5,597.93
$ 5,587.80
$ 16,786.80
Year 1960: Cattle sales
$44,143.72
$44,143.73
$44,143.73
$132,431.18
Potato sales
2,564.19
0
0
2,564.19
Total sales
$46,707.91
$44,143.73
$44,143.73
$134,995.37
Cattle purchases
$24,213.05
$24,213.05
$24,213.05
$ 72,639.15
Potato purchases
1,800.00
0
0
1,800.00
Total purchases
$26,013.05
$24,213.05
$24,213.05
$ 74,439.15
Gross profit
$20,694.86
$19,930.68
$19,930.68
$ 60,556.22
Year 1960: Expenses: Feed
$15,325.78
$15,325.78
$15,325.78
$ 45,977.34
Interest
499.38
454.96
512.15
1,466.49
Accounting & misc.
10.54
10.00
12.02
32.56
Total expenses
$15,835.70
$15,790.74
$15,849.95
$ 47,476.39
Net profit reported
$ 4,859.16
$ 4,139.94
$ 4,080.73
$ 13,079.83
Year 1961: Cattle sales
$58,743.36
$58,743.36
$58,743.36
$176,230.08
Grain sales
1,150.50
338.97
0
1,489.47
Gross receipts
$59,893.86
$59,082.33
$58,743.36
$177,719.55
Cost of sales: Beginning cattle inventory
$21,942.52
$21,942.52
$21,660.02
$ 65,545.06
Purchases
30,565.11
30,565.11
30,565.11
91,695.33
Less ending inventory
(17,731.40)
(17,731.40)
(17,731.40)
(53,194.20)
Cost of sales
$34,776.23
$34,776.23
$34,493.73
$104,046.19
Gross profit
$25,117.63
$24,306.10
$24,249.63
$ 73,673.36
Expenses: Feed
$17,958.87
$17,958.87
$17,958.87
$ 53,876.61
Taxes & licenses
148.83
148.83
148.83
446.49
Interest
224.45
213.29
373.07
810.81
Accounting
15.00
15.00
15.00
45.00
Total expenses
$18,347.15
$18,335.99
$18,495.77
$ 55,178.91
Net profit
$ 6,770.48
$ 5,970.11
$ 5,753.86
$ 18,494.45
*210 Except for two years, Henry did his banking business from 1939 to 1963 with the Hazelton State Bank. He always has had an open line of credit there and has relied on the bank for loans to purchase cattle, first for himself and later for Jones Livestock. While banking regulations specify that no one individual corporation can borrow in excess of 10 percent of the bank's capital unless the excess is secured by 115 percent of the loan, Hazelton State Bank has arranged for others to loan Henry the excess of his needs over 10 percent of its capital. In connection with the loans to Jones Livestock from the Hazelton State Bank, the procedure was as follows: Henry would submit a financial statement to the bank. As security for the loan, the bank would take a chattel mortgage on all the cattle possessed and owned by Jones Livestock. Periodically officers of the bank would inspect the premises of Jones Livestock and inventory the cattle there. On May 7, 1957, Calvin had a savings account in the Hazelton State Bank containing a balance of $400.21. On that date the savings account was closed and a checking account in the amount of $581.33 was opened in the Hazelton Bank in the name of Henry *211 Calvin Jones, c/o Henry Jones, Edens, Idaho. In addition to Calvin, Henry and Eunice were able to draw checks on this account. On May 7, 1957, Rene had a savings account at the Hazelton State Bank containing a balance of $637.22. On that date the savings account was closed and a checking account in the amount of $813.07 was opened in the name of Lois Irene Jones, c/o Henry Jones, Eden, Idaho. In addition to Rene, Henry and Eunice were able to draw checks on this account. Likewise, Jim had a savings account in the amount of $418.35 with the Hazelton State Bank on May 7, 1957. On that date the account was closed and a checking account opened in the amount of $620.25 in the name of James Thomas Jones, c/o Henry Jones, Eden, Idaho. In addition to Jim, Henry and Eunice were able to draw checks on this account. From 1958 through 1965, Henry, or an order buyer acting on his instructions, purchased small groups of cattle for the Jones children. Title was placed in the party making the actual purchase, namely, Henry or the order buyer. Payment was sometimes made by checks on the children's individual accounts directly to the seller or auction company. At other times Henry would draw a *212 check on the Jones Livestock account and would reimburse the company through checks drawn on the children's individual accounts. Such checks were usually written by Henry for the children. The Jones children raised capital for their cattle purchases by obtaining loans from the Hazelton State Bank. Henry usually acted as guarantor on the notes and often signed them on behalf of the children. The bank kept a separate loan sheet for each of the four Jones children. Under Section 32-101, Idaho Code, minors are defined as males under 21 years of age and females under 18 years of age. Section 32-103 sets forth the right of a minor to disaffirm his contract, as follows: Contracts of minors. Disaffirmance. In all cases other than those specified in the next two (2) sections [not applicable here] the contract of a minor, if made whilst he is under the age of eighteen (18), may be disaffirmed by the minor himself, either before his majority or within a reasonable time afterwards; or, in the case of his death within that period, by his heirs or personal representatives; and if the contract be made by the minor whilst he is over the age of eighteen (18), it may be disaffirmed in like manner *213 upon restoring the consideration to the party from whom it was received, or paying its equivalent. The proceeds from the sale of the cattle were placed in the individual checking accounts of the children. These funds were used to repay the loans and to cover the costs of feeding, freight, ad valorem taxes assessed on the cattle, and other miscellaneous expenses. Jones Livestock fed the cattle and charged the children the cost of feed plus 6 cents a day per head for handling expenses. The children sometimes went with Henry to cattle sales, inspected the cattle, and took part in discussions with regard to the sale of the cattle. By establishing his children in the cattle business Henry hoped to stimulate their interest in farming and cattle raising. In line with Henry's intent, Calvin lived in Eden in 1959 and 1960 and bought his own farm near Eden in a subsequent year. Carol married Don McFarland of Eden, an active cattleman, in 1959 and lived in Eden during the years in question. However, Rene was in Eden only briefly during these years and Jim was away at college. Henry bought smaller, quality cattle for the children than he did for Jones Livestock because less risk was involved. *214 Only one cattle transaction in which the children were involved resulted in a loss, although the children realized that the possibility of losses was always present. The following schedule shows the source and application of funds for the three children during the years 1959 through 1961: For the year ended
December 31, 1959
Henry
James
Lois
Calvin
Thomas
Irene
Jones
Jones
Jones
Funds were provided
Bank balance 1/1/59
$ 295.66
0
0
Cattle sales
42,935.76
$42,935.76
$42,935.76
Loans from bank
13,173.80
13,468.78
13,709.39
Wages
0
146.25
0
Total funds provided
$56,405.22
$56,550.79
$56,645.15
Funds were applied
Cattle purchases
$23,707.43
$23,707.43
$23,707.43
Feed
12,076.43
12,076.43
12,076.43
Loan payments
12,403.57
12,311.77
12,701.92
Other expenses
290.12
286.98
300.25
Personal
278.95
519.46
210.40
Balance in bank 12/31/59
7,648.72
7,648.72
7,648.72
$56,405.22
$56,550.79
$56,645.15
Inventory of cattle 1/1/59
$ 7,363.85
$ 7,363.85
$ 7,363.85
For the year ended
December 31, 1960
Funds were provided
Balance in bank 1/1/60
$ 7,648.72
$ 7,648.72
$ 7,648.72
Cattle sales
44,143.73
44,143.72
44,143.73
Loans from bank
21,719.59
23,462.74
28,934.74
Potato sales
0
2,564.19
0
Wages
0
135.80
0
Total funds provided
$73,512.04
$77,955.17
$80,727.19
Funds were applied
Cattle purchases
$40,055.57
$40,055.57
$39,773.07
Feed
15,325.78
15,325.78
15,325.78
Loan payments
16,280.29
18,579.12
18,770.97
Other expenses
464.96
509.92
524.17
Personal
1,385.44
1,684.78
6,388.07
Balance in bank 12/31/60
0
0
(54.87)
Potatoes purchased
0
1,800.00
0
$73,512.04
$77,955.17
$80,727.19
Inventory of cattle 1/1/60
$ 6,100.00
$ 6,100.00
$ 6,100.00
For the year ended
December 31, 1961
Funds were provided
Bank balance 1/1/61
0
0
(54.87)
Cattle sales
$58,743.36
$58,743.36
$58,743.36
Gift from Henry Jones
0
0
150.00
From Skeleton Butte
1,703.17
1,703.17
1,703.17
Loans from bank
12,250.00
14,000.00
24,500.00
Others
338.97
1,150.50
0
Total funds provided
$73,035.50
$75,597.03
$85,041.66
Funds were applied
Cattle purchases
$30,565.11
$30,565.11
$30,565.11
Feed
17,958.87
17,958.87
17,958.87
Investment Skeleton
3,000.00
3,000.00
3,000.00
Personal
1,046.53
4,494.89
8,644.04
Other expenses
377.12
405.78
536.90
Loan repayments
10,858.86
10,401.83
16,053.67
Bank balance 12/31/61
9,229.01
8,770.55
8,283.07
$73,035.50
$75,597.03
$85,041.66
Inventory 1/1/61
$21,942.52
$21,660.02
$21,942.52
Inventory 12/31/61
$17,731.40
$17,731.40
$17,731.40
*215 The profits on the cattle transactions were reported by the children and each child's income taxes were paid out of his checking account. The children were free to use the profits from these cattle transactions in whatever manner they desired. The following is a comparison of sales and net profits as between Jones Livestock and the children's operations: Corporation sales and profit: FY 1959
FY 1960
FY 1961
Corporation sales
$2,830,293.91
$2,565,332.35
$2,062,805.67
Gross profit
993,660.64
1,074,499.44
954,519.39
Net profit
49,899.32
37,242.16
44,598.88
Percentage of net profit to sales
1.75%
1.45%
2.16%
Children's feeding operations, sales and
profit: Sales
$ 128,807.28
$ 132,431.18
$ 176,230.08
Gross profit
84,793.44
60,556.22
73,673.36
Net profit
16,786.80
13,079.83
18,494.45
Percentage of net profit to sales
13.03%
9.88%
10.49%
In his notice of deficiency the respondent determined that the income from the sale of the cattle was properly taxable to Jones Livestock as the taxable entity which earned the income under section 61 and, accordingly, allocated the gross income from the sale of the cattle and the expenses *216 relative thereto to Jones Livestock under section 482 in order to prevent the avoidance of tax and to clearly reflect the income of Jones Livestock. In addition, the respondent determined that the net income deposited in the bank accounts of the Jones children was dividend income to their father. In 1960 Jim was in the hospital recovering from an automobile accident. His father asked him if he wanted to speculate in potatoes. Jim drew a check for $1,800 on his account payable to Jones Livestock to purchase an undivided interest in potatoes previously purchased by Jones Livestock. When the potatoes were subsequently sold at a profit, Jim received a check from Jones Livestock for his undivided pro rata share of the proceeds, amounting to $2,564.19. This check was deposited in Jim's checking account and he reported the profit from the transactions as income in 1960. In 1963, Jones Livestock paid $2,150 for a weather forecasting service which contained complex weather charts utilized to anticipate prices on feeder and fat cattle. In that same year Henry kept a commodity ticker tape in his office. In a prior year he made $100,000 speculating on the price of soybeans. One factor affecting *217 the price of soybeans was weather conditions. In 1963, Jones Livestock, in compensation for services rendered, gave its employees 10 head of cattle. These cattle were low grade Jersey steers whose value did not exceed $200 a head. Ultimate Findings 1. The Jones children were in the cattle business during the years 1959 through 1961. Their business transactions with Jones Livestock were at arm's length. The capital with which the cattle purchased belonged to the children and they had control over the profits from their sale. Therefore, the income from the cattle transactions was earned by the children and is taxable to them. 2. The amount received by Him in 1960 from the potato transaction is taxable as his income. 3. The amount paid in the fiscal year ended November 30, 1963, for the weather forecasting service is deductible as an ordinary and necessary business expense of Jones Livestock. 4. The amount of $2,000, representing the value of 10 Jersey cattle given to employees as bonuses, is deductible as an ordinary and necessary business expense of Jones Livestock for the fiscal year ended November 30, 1963. Opinion 1. Cattle transactions. On this, the principal issue, *218 the petitioners claim that Rene, Jim, and Calvin were in the cattle business and that their dealings with their father and Jones Livestock Feeding Company were genuine arm's-length transactions. Consequently, they assert that all the income earned from such operations was theirs. Respondent, on the other hand, contends that all the income from these cattle transactions, which he asserts were carried on in the names of Rene, Jim, and Calvin [2] during the years 1959 through 1961, should be taxed to the corporation (and to Henry Jones as a constructive dividend) because the transactions were not at arm's length. He characterizes what occurred here as the "mere assignment of income" earned by the corporation and distributed to the Jones children "either as a gift from their father or in discharge of their father's obligations." Respondent places heavy reliance on our opinion in Adolph J. Urbanovsky, T.C. Memo. 1965-276, *219 in which we held that the taxpayer did not make valid gifts of steers to his children and thus concluded that amounts received from the sale of the steers were his income and not that of the children to whom the purported gifts were made. Petitioners rely on Visintainer v. Commissioner, 187 F. 2d 519 (C.A. 10, 1951), reversing 13 T.C. 805 (1949), certiorari denied 342 U.S. 858 (1951), and Alexander v. Commissioner, 190 F. 2d 753 (C.A. 5, 1951), reversing a Memorandum Opinion of this Court. In those cases the Courts of Appeals for the Tenth and Fifth Circuits found valid gifts of sheep and cattle from parent to child and held that income derived from their sale was properly attributed to the children and not to the parents. In each of these three cases the critical question was whether there was a valid completed gift from parent to child. The courts agreed that, while transactions between members of a family which have the effect of reducing taxes must be closely examined, see Finley v. Commissioner, 255 F. 2d 128 (C.A. 10, 1958), there is no objection inherent in the fact that the owner and manager of the incomeproducing *220 property are members of the same family. See Henson v. Commissioner, 174 F. 2d 846 (C.A. 5, 1949); and Willis H. Vance, 14 T.C. 1168 (1950). But here there was no gift from one related party to another. Henry gave his children neither money nor cattle. The funds with which the children purchased cattle were borrowed by them from the Hazelton State Bank. We cannot agree with respondent that these were actually loans to Henry on the theory that they were unenforceable obligations of the children. Under Idaho law, Rene was not a minor in 1959 since she was over 18 years of age. Even though Jim and Calvin were minors, since Henry signed the notes as guarantor and the bank regarded this as sufficient collateral for a bona fide loan, we fail to see why the loans to Jim and Calvin should be treated any differently than those to Rene. We think the money borrowed by the Jones children became their own capital and the cattle purchased were theirs. Cf. Alexander v. Commissioner, supra, and Visintainer v. Commissioner, supra.Moreover, in line with their business operations, the Jones children paid the corporation for feeding costs and other *221 services rendered (including the services of Henry as its agent); and any other assistance which Henry gave them was no more than could be expected from a devoted father looking out for the interests of his children. Since there is no evidence of a gift to the Jones children, this case, unlike Urbanovsky, Visintainer, and Alexander, does not turn upon whether or not a valid gift was made. Facing us are simply two factual questions: First, who owned the cattle? Secondly, who earned the income from the cattle transactions? As our ultimate findings of fact reflect, on this record we agree with the position of the petitioners. In our opinion the children owned the cattle and they earned the profits from the sales after fairly compensating Jones Livestock for its services. The funds received by the children were deposited in their individual checking accounts. Rene used her money to do extensive traveling; Jim went to college; and Calvin bought a farm. While Henry had authority to draw on the bank accounts, there is no evidence that he did so except in furtherance of his children's cattle operations. Nor is there evidence that the funds were used to provide necessaries for the children. *222 In 1958 Henry Jones decided to try to interest his children in the cattle feeding business. To stimulate their interest he helped them start their own feeding of cattle. The first step taken was to cash their war bonds and close out their savings accounts. In doing so the children signed the bonds and the withdrawal slips. Checking accounts were opened. The children signed the signature cards. Idaho Code Section 26-1010 provides that checks written by children are valid. Since the checking accounts were insufficient to finance their first purchase of cattle, funds were borrowed by the children from the Hazelton State Bank and deposited in their checking accounts. The children signed the notes and Henry guaranteed them individually. Jones Livestock had no legal liability to see that the notes were paid. One or more of the children accompanied Henry to cattle sales. Cattle were bought for the children and they issued checks for their pro rata shares. The cattle were shipped to the yards of the corporation and put in a pen separate from Jones Livestock's cattle. Jones Livestock fed the cattle. Under a so-called custom feeding arrangement, which resulted in a profit to the corporation, *223 the children paid the cost of feed plus 6 cents a head per day. After the cattle were fed out they were sold. Checks were issued to one or more of the children, but the proceeds were split pro rata among the children's accounts. In these circumstances it is our view that the children contributed the capital to purchase the cattle and they earned the income from the sale of those cattle. The mere fact that Henry managed their income-producing property either as an agent of Jones Livestock or as a father who wanted to encourage his children to become farmers and cattle raisers is not sufficient to visit the tax consequences of the cattle transactions upon him. Here there was managerial control over income-producing property with the consent of the owners (the children) rather than absolute control over the cattle or the income derived therefrom. We think the distinction is crucial. Cf. Alexander v. Commissioner, supra. Accordingly, we hold that the respondent erred in determining that the income from the cattle transactions is taxable to Jones Livestock. It follows from this conclusion that the income in dispute is not taxable to Henry Jones as a constructive dividend. *224 2. Potato transaction. While Jim was in the hospital in 1960, Henry asked him if he wanted to purchase an undivided interest in some potatoes which Henry was buying for Jones Livestock. Jim wrote a check for $1,800 to purchase an interest in them. When the potatoes were sold, Jim received his pro rate share of the proceeds. As with the cattle transactions, Jim ventured his own capital in investing in potatoes. He later received the proceeds as a return on this investment. The fact that Henry gave him advice and that Jones Livestock was a party to the same transaction does not affect the nature of the transaction. Jim invested his own money in income-producing property. The income resulting therefrom was his income. Therefore, it follows that the profit received by Jim on the transaction is not taxable to Henry as a constructive dividend. 3. Weather forecasting service. In its fiscal year ended November 30, 1963, Jones Livestock deducted the cost of a weather forecasting service for which it paid $2,150. Although this service was discontinued shortly after its purchase, Henry had hoped that its charts would help Jones Livestock predict the fluctuations in the price of feeder cattle. *225 As such, it was a deductible business expense. Respondent argues that the service was purchased for the personal investments of Henry because he was an astute trader on the commodities market and weather conditions were a key factor affecting the prices of futures. While Henry may have used the weather reports in connection with his private investments, the evidence here shows that the weather service was bought by Jones Livestock for the primary purpose of evaluating its long-range feeder cattle market. Any incidental use of the service by Henry for personal business does not change what was otherwise an ordinary and necessary business expense of Jones Livestock into a personal business expense of Henry paid for by the corporation. Cf. Rodgers Dairy Co., 14 T.C. 66 (1950). 4. Gifts of cattle to employees. Respondent disallowed a deduction of $6,250 claimed by Jones Livestock in the fiscal year ended November 30, 1963, for "cost of cattle given to others." Henry testified that Jones Livestock butchered about 10 Jersey cattle valued at $200 each and gave them to employees as bonuses. Since the cattle were in the nature of additional compensation to corporate employees, *226 the value of the cattle given to them is deductible as an ordinary and necessary business expense of Jones Livestock. The remaining amount ($4,250) must be disallowed for failure of proof. To reflect concessions, uncontested adjustments, and our conclusions with respect to the contested issues, Decisions will be entered under Rule 50. Footnotes
1. All references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Oddly enough, the respondent did not determine any deficiencies against Carol Jones McFarland and husband, Don, for the years 1959 through 1961 although the gains they reported from cattle operations were similar to those of the other Jones children.↩